1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9             FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    C.R., by and through her guardian ad litem,         No. 2:20-cv-02296-KJM-AC
      Tiffany Roe,

12                                                          ORDER
                         Plaintiff,

13

14            v.

15    Elk Grove Unified School District, et al.,

16                        Defendants.

17            C.R., a minor, represented in this action by her grandmother as guardian ad litem,

18    pseudonymously named Tiffany Roe, alleges Elk Grove Unified School District (EGUSD),

19    Capitol Elementary School (CES), Ira Ross, and Marilyn Delgado violated various California and

20    federal statutes by not properly supervising C.R. when she was a student at CES.  Consequently,

21    she was the victim of sexual harassment, sexual abuse and sexual assault by fellow students.

22            Three motions are currently before the court.  C.R. seeks the court's permission to amend

23    her complaint (ECF No. 138).  CES and Ross seek partial judgment on the pleadings of C.R.'s

24    ADA Title III claim against them (ECF No. 120), and CES and Ross seek partial summary

25    judgment of three other claims based on § 504 of the Rehabilitation Act of 1973 (claim three),

26    California's Unruh Civil Rights Act (claim five) and various California statutes relating to

27    negligence committed by public entities (claim six) (ECF No. 119).

1

1    As explained in this order, the court grants C.R.'s motion for leave to amend because she

2    has shown good cause, denies Ross's and CES's motion for judgment on the pleadings as moot,

3    and grants in part and denies in part CES's and Ross's motion for partial summary judgment.

4    **I.    UNDISPUTED FACTS**

5    C.R. was diagnosed with autism as a child and has "difficulty with social engagement,

6    including but not limited to, the ability to (a) understand social cues, (b) understand right from

7    wrong, and (c) communicate internal emotions and conflict." Compl. ¶ 17, ECF No. 1. C.R. also

8    has been diagnosed with fetal alcohol syndrome. *Id.* ¶ 18.

9    In 2019, C.R. enrolled in CES. *Id.* ¶ 19. The claims in this case stem from C.R.'s

10    allegations that two classmates sexually assaulted and raped her at school. *See id.* ¶¶ 23–48. Her

11    grandmother, Roe, claims C.R. told her about what was happening to her at school, and Roe

12    alleges she tried again and again to persuade C.R.'s teachers and the school's administrators to

13    investigate and intervene, but she claims the abuse continued until she removed C.R. from the

14    school. *See id.* Roe also alleges she urged the school district to intervene without success,

15    including by contacting Delgado, who is a specialist at the district with responsibilities over

16    students in non-public schools. *See id.* ¶¶ 9, 31–32, 37, 42–43, 45, 47.

17    One aspect of the current dispute is whether CES operates as a school or as a business.

18    California has categorized CES as a "nonpublic school." *See* Ross Decl. ¶ 2, ECF No. 119-3.

19    Nonpublic schools are "private" and "nonsectarian" schools that enroll "individuals with

20    exceptional needs pursuant to an individual education program [IEP]." Cal. Educ. Code § 56034.

21    Nonpublic schools provide services to these students when their traditional public school cannot

22    accommodate the students' IEPs. *See* Ross Decl. ¶ 4. These needs include "Autism, Attention-

23    deficit/hyperactivity disorder[,] specific learning disabilities, significant emotional and/or

24    behavioral problems and/or cognitive deficits." *Id.* ¶ 5. CES provides services like "specialized

25    academic instruction, speech and language therapy, educational related mental health services,

26    and parent counseling" to students. *Id.* ¶ 8. Ira Ross is the Chief Executive Officer, Executive

2

1    Director and sole owner of CES.  *Id*. ¶ 1; Ross Dep. at 124.[1]  Ross founded CES in 2015.  Ross

2    Dep. at 119.  CES is incorporated in the State of California.  Commons Decl. Ex. 9, ECF

3    No. 135-9.  CES is a "for profit business" and takes in something like "$2 million" per year in

4    revenue.  Ross Dep. at 125.

5        Another aspect of the parties' current dispute relates to the sources of CES's funding, so a

6    few details about that funding are required to set the stage.  Unlike a true private school, CES

7    does not charge tuition.  Ross Decl. ¶ 10.  Nor does CES "bill the federal government."  *Id.* ¶ 15.

8    Instead, CES has "Master Contract[s]" with the school districts that refer students to CES.  *Id.*

9    ¶ 11.  CES had a master contract with EGUSD during the school year of 2019–2020 when C.R.

10   attended CES.  *See* Linkert Decl. Ex. 2 (Master Contract), ECF No. 67-3.  These master contracts

11   are required by California law.  *See* Cal. Educ. Code § 56366.  They include a "description of the

12   process being utilized by the local educational agency (LEA) to oversee and evaluate placements

13   in nonpublic nonsectarian schools, as required by federal law."  *Id.* § 56366(a)(2)(B).  Each

14   month CES serves a student, it "submits an invoice . . . to the student's district for payment."

15   Ross Decl. ¶ 12.  EGUSD is an LEA that refers students to CES.  *See id.* ¶ 6.  Ross estimates that

16   "25, 30 percent" of CES's business comes from referrals from EGUSD.  Ross Dep. at 128.

17   EGUSD pays CES hundreds of thousands of dollars annually.  *Id.* at 125.

18       Some of the funding that makes its way to CES can be traced to the requirements of the

19   federal Individuals with Disabilities Education Act (IDEA).  20 U.S.C. §§ 1400–1482.  Under the

20   IDEA, Congress disburses funds to states to subsidize the costs of special education.  *Id.* §§ 1411,

21   1413.  California has passed legislation for the disbursement of IDEA funds to LEAs and to

22   private schools.  *See* Cal. Educ. Code §§ 56170–56172, 56837.  Under these laws, nonpublic

23   schools are not considered "private schools" chosen by the parent.  *See* Cal. Educ. Code § 56170.

24   Instead, school districts make nonpublic schools an option available to students with disabilities

25   "if no appropriate public education is available."  Cal. Educ. Code § 56365(a).  Students with

_____

[1] The court cites to page numbers here according to those applied at the top right corner of
the page by the CM/ECF system, with the exception of the deposition of Ira Ross.  The parties
provided the court a complete electronic copy of Ross's deposition prior to oral argument and the
court uses the original deposition pagination for citations to Ross's deposition.

1   disabilities attending nonpublic schools "are deemed to be enrolled at public schools" for funding

2   purposes, including disbursement of IDEA funds.  *Id.* § 56365(b)–(c).

3        IDEA funds come with regulatory obligations.  Nonpublic schools must meet the

4   strictures of 34 C.F.R. § 300.146.  *See* Cal. Educ. Code § 56365(a).  That regulation requires

5   nonpublic schools provide an education in conformity with the child's IEP that comes at no cost

6   to the parents.  34 C.F.R. § 300.146(a).  The regulation also requires the child in a nonpublic

7   school to have "all of the rights of a child with a disability who is served by a public agency." *Id.*

8   § 300.146(c).

9        C.R. has requested the court take judicial notice of publicly available EGUSD financial

10  plans and funding formulas.  *See* ECF No. 134.  CES and Ross do not oppose the request.  The

11  court takes judicial notice of the documents as they are publicly available on EGUSD's website

12  and their authenticity is not in question.  *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992,

13  998–99 (9th Cir. 2010) (finding "it is appropriate to take judicial notice of" information found on

14  public school websites if neither party disputes the information's accuracy or the websites

15  authenticity).

16       These financial documents reveal EGUSD disbursed IDEA funds in 2019–2020, the

17  academic year C.R was enrolled at CES.  *See* Compl. § 22.  In its Local Control Accountability

18  Plan for 2016–2019, EGUSD planned to "[p]rovide students with disabilities instruction support

19  and resources to promote academic achievement as appropriate to each students' individualized

20  education program (IEP) to supplement State and Federal funding."  Commons Decl. Ex. 1 at 76,

21  ECF No. 135-1.[2]  In its 2018–2019 fiscal year report, EGUSD reported it received

22  $10,136,693.00 in federal IDEA funding.  Commons Decl. Ex. 4 at 198, ECF No. 135-4.[3]  In its

---

[2] https://www.egusd.net/documents/District/FundingBudget/LCFF-LCAP/FINAL_LCAP_BOARD_APPROVED_6-28-16-sqbo1i.pdf (accessed May 8, 2025).

[3] https://www.egusd/documents/District/FundingBudget/District-Operating/Signed-Unaudited2.pdf (accessed May 8, 2025).

1    2019–2020 financial report, EGUSD reported receiving similar IDEA funding for that year.

2    Commons Decl. Ex. 6 at 201, ECF No. 135-6.[4]

3        Finally, C.R. has requested the court take judicial notice of CES having received loans of

4    $262,000 in April 2020 and $276,240 in April 2021 under the federal Paycheck Protection

5    Program (PPP), offered during the COVID-19 pandemic. *See* Req. Jud. Notice at 5; Commons

6    Decl. Ex. 5 at 2, ECF No. 135-5; Commons Decl. Ex. 8 at 2, ECF No. 135-8; *see also* Paycheck

7    Protection Program and Health Care Enhancement Act, Pub. L. No. 116-139, 134 Stat. 620

8    (Apr. 24, 2020).[5]  CES and Ross do not object to the court's taking judicial notice of these

9    documents or the accuracy of these documents; the court finds taking notice of the loans to be

10   appropriate as they are publicly available on a federal government website and their authenticity

11   is not in question. *See Daniels-Hall*, 629 F.3d at 998–99.

12   **II.    PROCEDURAL BACKGROUND**

13       C.R. brings six claims against EGUSD, CES, Ross and Delgado.  She alleges EGUSD and

14   CES violated Titles II (claim one) and III (claim two) of the American with Disabilities Act

15   (ADA), 42 U.S.C. §§ 12131–12134, §§ 12181–12189.  She also alleges both EGUSD and CES

16   violated § 504 of the Rehabilitation Act of 1973 (§ 504), 29 U.S.C. § 794 (claim three) and Title

17   IX, 20 U.S.C. § 1681 (claim four).  Further, she alleges all four defendants violated the California

18   Unruh Civil Rights Act (Unruh Act), Cal. Civ. Code § 51 (claim five), and various public entity

19   negligence statutes under California law (claim six).  C.R. seeks general and special damages as

---

[4] https://www.egusd/documents/District/FundingBudget/District-Operating-Budget/2019-2020-UNAUDITED-ACTUALS.pdf (accessed May 8, 2025).

[5] For the 2020 loan, *see* https://www.pandemicoversight.gov/ppp-simple-search-landing?pfilters=%5B%7B%22column%22%3A%22Borrower%22%2C%22operand%22%3A%22IN%22%2C%22values%22%3A%5B%22CAPITOL+ELEMENTARY+INC.%22%5D%7D%2C+%7B%22column%22%3A%22Borrower+city%22%2C%22operand%22%3A%22IN%22%2C%22values%22%3A%5B%22Sacramento%22%5D%7D%5D (accessed May 8, 2025).  For the 2021 loan, *see* https://www.pandemicoversight.gov/ppp-simple-search-landing?pfilters=%5B%7B%22column%22%3A%22Borrower%22%2C%22operand%22%3A%22IN%22%2C%22values%22%3A%5B%22CAPITOL+ELEMENTARY+SCHOOL+INC.%22%5D%7D%2C+%7B%22column%22%3A%22Borrower+city%22%2C%22operand%22%3A%22IN%22%2C%22values%22%3A%5B%22Sacramento%22%5D%7D%5D (accessed May 8, 2025).

1    well as punitive damages, costs, attorneys' fees and pre-judgment interest.  Compl. at 22 ("Prayer

2    for Relief").

3         CES and Ira Ross move for partial summary judgment of C.R.'s Rehabilitation Act claim

4    (claim three), her Unruh Act claim (claim five) and her sixth claim, which alleges violations of

5    several California statutes relating to negligence by public entities.  *See* CES and Ross's Mot.

6    Partial Summ. J. (Mot.), ECF No. 119.  The motion is now fully briefed.  *See* Mem., ECF

7    No. 119-1; Opp'n, ECF No. 132; Reply ECF No. 140.  CES and Ross also move for partial

8    judgment on the pleadings, seeking dismissal of the ADA Title III claim.  ECF No. 120.  C.R.

9    does not oppose that motion.  Pl.'s Stmt. Non-Opp'n, ECF No. 131.

10        The parties attempted to stipulate to an amended complaint but could not arrive at an

11    agreement.  After meeting and conferring in August 2024, *see* Gallo Decl. ¶ 1, ECF No. 138-1,

12    the parties stipulated to dismissal of C.R.'s ADA Title III claim (claim two) against CES and to

13    dismissal of the Unruh Act claim (claim five) against EGUSD and Delgado.  *See* Proposed Order

14    Partial Dismissal, ECF No. 124-1.  The court denied the stipulation and ordered C.R. to amend

15    her complaint based on the Ninth Circuit's decision in *Hells Canyon Preservation Council v.*

16    *United States Forest Service*.  *See* Min. Order (Aug. 22, 2024), ECF No. 125 (citing 403 F.3d

17    683, 687–89 (9th Cir. 2005)).  The parties also disputed the scope of C.R.'s sixth claim.  *See*

18    Gallo Decl. ¶¶ 2–3.  C.R. argued it encompassed both a statutory and common law negligence

19    claim, while all defendants argued it only included a statutory negligence claim.  *See* Van Dine

20    Decl. Ex. 2, ECF No. 141-1; EGUSD & Delgado Stmt. Partial Non-Opp. at 2, ECF No. 142.

21        C.R. eventually moved for leave to amend her complaint.  ECF No. 138.  The proposed

22    amended complaint does not include her ADA Title III claim (claim two in the operative

23    complaint) against all defendants.  *See id.* at 3.  It also does not name EGUSD and Delgado as

24    defendants on C.R.'s Unruh Act claim (claim five in the operative complaint), removes CES and

25    Ross from C.R.'s statutory negligence claim, but adds language relating to a common law

26    negligence claim against all defendants (claim six in the operative complaint).  *See* Mot. Am.

27    Compl. Ex. 2 (Redlines), ECF No. 138-3.  The motion is fully briefed.  *See* CES & Ross Opp'n,

28    ECF No. 141; EGUSD & Delgado Stmt. Partial Non-Opp'n.; Pl.'s Reply, ECF No. 144.

1        The court heard argument on all three motions on November 7, 2024.  Sean Commons,

2   Sarah Gallo and Kristina Martinez appeared on behalf of C.R.  Mins. for Mot. Hr'g, ECF

3   No. 146.  Richard Linkert and Madeline Mezger appeared on behalf of EGUSD and Marilyn

4   Delgado.  *Id.*  Cynthia Lawrence and Blaze Van Dine appeared on behalf of CES and Ross.  *Id.*

5   At oral argument, all parties agreed the court could resolve C.R.'s motion to amend her complaint

6   and CES and Ross's motions for partial judgment on the pleadings and partial summary judgment

7   together.[6]

8   **III.    AMENDED COMPLAINT**

9        The court addresses C.R.'s motion for leave to amend her complaint first.  Because the

10  deadline for amendments has passed, *see* Order (March 31, 2021), ECF No. 19, C.R. cannot

11  amend her complaint unless she shows "good cause" to extend that deadline, *see* Fed R. Civ. P.

12  16(b).  "The good cause standard primarily considers the diligence of the party seeking the

13  amendment."  *Kamal v. Eden Creamery, LLC*, 88 F.4th 1268, 1277 (9th Cir. 2023) (internal

14  quotations and citations omitted).  "Although the existence or degree of prejudice to the party

15  opposing the modification might supply additional reasons to deny a motion, the focus of the

16  inquiry is upon the moving party's reasons for seeking modification."  *Id.* (internal citations and

17  quotations omitted).

18       Here, C.R. has offered good cause for some of her proposed amendments.  Specifically,

19  she has offered good cause to not include her ADA Title III claim for all defendants (claim two),

20  to remove EGUSD and Delgado as defendants in her Unruh Act claim (claim five), and to remove

21  CES and Ross as defendants from her statutory negligence claim (claim six).  *See* Mot. Am.

22  Compl. at 3.  These amendments clarify and focus the issues and avoid unnecessary post-

23  discovery litigation.  *Id.*  Further, all parties agree on these changes.  *See generally* CES & Ross

24  Opp'n, ECF No. 141; EGUSD & Delgado Stmt. Partial Non-Opp'n.[7]

---

[6] The court also heard oral argument on the motion filed at ECF No. 67 and resolves that motion in a concurrently filed order.

[7] This proposed amendment satisfies *Hells Canyon*, as it is governed by Rule 15 as opposed to Rule 41, which "does not allow for piecemeal dismissals."  403 F.3d at 687.

1    The potential sticking point, however, is C.R.'s proposed changes to her negligence claim.

2    C.R. claims over the summer of 2024, she became aware CES disputed her interpretation of the

3    sixth claim.  Gallo Decl. ¶¶ 2–4,.  She believed it had always contained a common law negligence

4    claim as well as statutory negligence claims relating to public entities.  *See id.*  CES and Ross,

5    meanwhile, read the complaint as asserting statutory negligence claims relating to public entities

6    only.  *See* Van Dine Decl. Ex. 2.  The difference is important because, as C.R. recognizes, CES

7    and Ross cannot be liable for statutory negligence under these statutes as  CES is a non-public

8    entity.  *See* Mot. Am. Compl. at 3.

9    C.R. argues altering the negligence claim would offer clarity to the parties.  *See id.*  CES

10    and Ross oppose these changes and argue the "proposed amended complaint goes beyond simple

11    clarification.  Plaintiff is seeking to include new allegations against Defendants."  CES & Ross

12    Opp'n at 5.  Delgado and EGUSD similarly oppose C.R.'s proposed alteration to the negligence

13    claim, arguing it "would allow Plaintiff to add claims and allegations after the close of discovery

14    and after the time for dispositive motions have [sic] long passed."  EGUSD & Delgado Stmt.

15    Partial Non-Opp. at 2.

16    If these were new allegations, as defendants suggest, then C.R. might not have good cause

17    to add them now, but C.R. put the defendants on "fair notice" of her common law negligence

18    theory of liability both in her initial complaint and in her discovery requests.  *See Pac. Coast*

19    *Fed'n of Fisherman's Ass'ns v. Glaser*, 945 F.3d 1076, 1087 (9th Cir. 2019) (allowing plaintiff's

20    seepage and sediment theories of liability to go forward even though the complaint did not

21    specifically allege them because defendants were on fair notice).  The complaint must further

22    include the "necessary factual allegations" to support such a claim.  *See id.*(citing *Navajo Nation*

23    *v. U.S. Forest Serv.*, 535 F.3d 1058, 1080 (9th Cir. 2008)).  As C.R. points out in her reply brief,

24    the original complaint contains allegations Ross and CES possessed a general "duty of care"

25    toward her and breached that duty.  Pl.'s Reply at 3; Compl. ¶¶ 108–110, 112–13.  C.R. alleges

26    CES and Ross had a duty to "use reasonable measures to protect students from foreseeable injury

27    at the hands of third parties."  Compl. ¶ 108.  She alleges CES and Ross had a "duty to protect

28    Plaintiff from sexual assault on campus."  *Id.* ¶ 109.  She also alleges CES and Ross are

8

1    "responsible for student supervision at CES" and had a "duty of care toward Plaintiff and other

2    students to prevent sexual violence, harassment, bullying, sexual violence, and gender

3    discrimination from occurring on the school premises." *Id.* ¶ 110.  The complaint also contains

4    factual allegations CES and Ross breached their duty toward C.R. by negligently allowing her to

5    suffer sexual assault and rape while attending school. *See id.* ¶¶ 23–48, 112–13.

6         Moreover, CES and Ross acted as though they were on notice of C.R.'s common law

7    negligence theory of liability.  In their answer, CES and Ross asserted both contributory and

8    comparative negligence affirmative defenses.  *See* Answer at 27, ECF No. 14.  Further, CES and

9    Ross "retained an expert to opine exclusively on the standard of care and supervision

10   requirements for non-public schools."  Reply at 4; *see* Gallo Decl. ¶ 6.  At hearing, CES and Ross

11   claim they had to assert affirmative defenses otherwise they might waive the opportunity to assert

12   them later.  But the fact that they pled them, and that C.R. argued they owed her a duty of care

13   and a duty to protect her in the original complaint shows they were on notice that she had a

14   negligence theory of liability against them and that she had pled sufficient facts to support such a

15   theory. *See* Compl. ¶¶ 23–48, 108–10, 112–13.

16        C.R's proposed amendments also include a claim of failing to train school personnel.  The

17   new language reads as follows:

18           Defendants CES and Mr. Ross had affirmative duties to adequately
19           train school personnel to intervene when a student faces sexual
20           harassment, abuse, and/or assault at the hands of peers.  They failed
21           to do so, resulting in CES employees' failure to protect Plaintiff in
22           the face of known, repeated assaults and harassment.

23   Redlines ¶ 95.  Defendants also were on notice of C.R.'s failure to train theory.  The initial

24   complaint alleges defendants failed to properly train their staff on at least three occasions. *See*

25   Compl. ¶¶ 57, 68, 93.  The factual allegations support this claim as well, as C.R. alleges she was

26   the victim of sexual assault as a result of this failed training. *See id.* ¶¶ 23–48.  Further the initial

27   title of C.R.'s sixth claim headlined defendants failed to perform mandatory duties "in . . .

28   [s]upervision and [t]raining. *Id.* at 20.  C.R.'s discovery requests and deposition questions also

29   put defendants on notice that a failure to train was a part of C.R.'s theory of negligence. *See*, *e.g.*,

1    Ross Dep. at 84–86 (discussing CES's training schedules produced in discovery).  Both CES and

2    Ross and Delgado and EGUSD argue the proposed new paragraph contains "new allegations."

3    CES & Ross Opp'n. at 5; EGUSD & Delgado Stmt. Partial. Non-Opp'n at 2.  But this argument is

4    not persuasive because, as noted above, they were or should have been on notice of C.R.'s failure

5    to train theory.

6          Finally, CES and Ross argue C.R. was not diligent in seeking to amend her complaint

7    because she waited too long to seek amendment.  *See* CES & Ross Opp'n at 4.  C.R. discovered

8    the parties disagreed on the scope of her negligence claim on August 2, 2024.  *See* Gallo Decl. ¶

9    2.  She filed a motion to amend her complaint on September 26, 2024.  *See generally* Mot. Am.

10    Compl.  The court disagrees with CES and Ross that this timeline reflects a lack of due diligence

11    by C.R.  C.R. filed the motion in time for it to be fully briefed and for the court to hear oral

12    argument alongside Ross's and CES's motion for partial summary judgment.  *See* Mins. for Mot.

13    Hr'g.

14          C.R. has shown good cause to amend her complaint.  All defendants agree the second

15    claim should be removed and that CES and Ross should be removed as defendants in C.R.'s

16    statutory negligence allegations in her sixth claim and that EGUSD and Delgado should be

17    removed as defendants in C.R.'s Unruh Act claim (claim five).  All defendants were or should

18    have been on notice of C.R.'s theories of a common law negligence claim for failing to supervise

19    and failing to train (claim six).  When C.R. discovered the parties disagreed as to the scope of her

20    sixth claim, she moved for amendment within a reasonable time.  The court grants C.R.'s motion

21    to amend her complaint.

22    **IV.    JUDGMENT ON THE PLEADINGS**

23          The court addresses CES's and Ross's motion for partial judgment on the pleadings as to

24    C.R.'s ADA Title III claim (claim two) next.  At oral argument, CES and Ross conceded that if

25    the court were to grant C.R.'s motion to amend her complaint, it would render this motion moot

26    because the amended complaint drops C.R.'s ADA Title III claim against all defendants.  Because

27    the court has granted C.R.'s motion to amend her complaint, it denies CES's and Ross's motion

28    for partial judgement on the pleadings as moot.

1    **V.    SUMMARY JUDGMENT**

2        CES and Ross seek summary judgment of C.R.'s Rehabilitation Act claim, her Unruh Act

3    claim, and her allegations that CES and Ross violated several California public entity statutes

4    (claims 3, 5 and 6). *See* Mem.  C.R. opposes summary judgment of the Rehabilitation Act and

5    Unruh Act claims but does not oppose summary judgment of the statutory negligence claims. *See*

6    *generally* Opp'n.

7        Summary judgment is appropriate if "there is no genuine dispute as to any material fact

8    and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is

9    "genuine" if "a reasonable jury could return a verdict for the nonmoving party."  *Anderson v.*

10   *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome

11   of the suit under the governing law."  *Id.*  The court views the record in the light most favorable

12   to the nonmoving party and draws reasonable inferences in that party's favor.  *Matsushita Elec.*

13   *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986); *Adickes v. S.H. Kress & Co.*,

14   398 U.S. 144, 157 (1970).

15       **A.    Evidentiary Objections**

16       It is first necessary to resolve a threshold evidentiary dispute.  Under Federal Rule of Civil

17   Procedure 56, litigants who move for or oppose summary judgment must cite "particular parts of

18   materials in the record" to show specific facts are disputed, undisputed or cannot be proved, as

19   the case may be.  *See* Fed. R. Civ. P. 56(c)(1).  This district's local rules implement the rule by

20   requiring a separate statement proposing undisputed facts.  *See* E.D. Cal. L.R. 260(a).  The

21   separate statement must "cite the particular portions" of the record that establish each proposed

22   fact as "undisputed."  *Id.*  The opposing party must then respond to each proposed fact and either

23   admit or deny the fact is undisputed.  *See* E.D. Cal. L.R. 260(b).  If the opposing party contends

24   the fact is disputed, it must cite "the specific particular portions" of the record showing the fact is

25   disputed.  *Id.*

26       CES and Ross filed the required separate statements along with their motion.  *See*

27   *generally* Stmt. Facts, ECF No. 119-2.  All CES's proposed undisputed facts are based on Ira

28   Ross's declaration in support of the motion.  *See generally* Ross Decl.  C.R. objects to many of

11

1    CES and Ross's  proposed facts.  Pl.'s Resps. & Evid. Objs., ECF No. 132-1.  The objections are

2    unpersuasive.  The most common objections C.R. makes are based on relevance, speculation, and

3    improper legal conclusions.  *See*, *e.g.*, Pl.'s Resps. & Evid. Objs. No. 4 (objecting to Ross's

4    statement about the services nonpublic schools provide as offering an inadmissible legal

5    conclusion).  But "objections to evidence . . . that it is irrelevant, speculative, and/or

6    argumentative, or that it constitutes an improper legal conclusion are all duplicative of the

7    summary judgment standard itself."  *Burch v. Regents of University of California*,

8    433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006).  If a purported fact is not material, i.e., if it is

9    irrelevant, a legal conclusion or is speculative, it is not germane to a Rule 56 analysis and no

10    objection is needed.  As a general rule, litigants should not append long lists of formulaic

11    objections to their summary judgment papers.  *See, e.g.*, *City of Lincoln v. County of Placer*,

12    668 F. Supp. 3d 1079, 1086 (E.D. Cal. 2023).  "This is especially true when many of the

13    objections are boilerplate recitations of evidentiary principles or blanket objections without

14    analysis applied to specific items of evidence."  *Doe v. Starbucks, Inc.*, No. 08-0582,

15    2009 WL 5183773, at *1 (C.D. Cal. Dec. 18, 2009).  C.R.'s objections are overruled to the extent

16    the court has relied on any of the disputed evidence in this order.

17              **B.      The Rehabilitation Act (Claim Three)**

18         CES and Ross seek summary judgment of C.R.'s § 504 Rehabilitation Act claim.  They

19    contend it is undisputed CES was not funded by the federal government when C.R. attended the

20    school.  *See* Mem. at 5–7.  Alternatively, they argue § 504 does not apply to them because they

21    were merely incidental beneficiaries of federal funding.  *See id.*  Finally, they contend § 504 does

22    not apply to them because they were only in a contractual relationship with EGUSD and did not

23    receive federal assistance.  *See id.*  The court disagrees on each point, as explained below.

24              **1.      Federal Funding**

25         Under § 504 of the Rehabilitation Act, "[n]o otherwise qualified individual with a

26    disability . . . shall, solely by reason of her or his disability, be excluded from the participation in,

27    be denied the benefits of, or be subjected to discrimination under any program or activity

28    receiving federal financial assistance."  29 U.S.C. § 794(a).  A Program or activity "means all of

12

1    the operations of . . . a local educational agency . . . or other school system."  29 U.S.C. § 794(b).

2    In other words, schools that receive federal financial assistance are subject to the Rehabilitation

3    Act.  *See Kling v. Los Angeles County*, 633 F.2d 876, 878 (9th Cir. 1980); *see also J.W. ex rel.*

4    *J.E.W. v. Fresno Unified School Dist.*, 570 F. Supp. 2d 1212, 1224 (E.D. Cal. 2008) (citing *Mark*

5    *H. v. Lemahieu*, 513 F.3d 922, 938 (9th Cir. 2008) (holding schools receiving federal financial

6    assistance are subject to the Rehabilitation Act).  Further, "[f]ederal financial assistance can be

7    direct or indirect."  *Herman v. United Bd. of Carpenters*, 60 F.3d 1375, 1381 (9th Cir. 1995).

8         Here, CES cites two facts to show it did not receive federal funding:

9         • CES did not bill the federal government; and

10        • CES did not receive payment from the federal government.

11   *See* Ross Decl. ¶¶ 15–16.

12        In response, C.R. argues CES received federal funding indirectly[8] during the time she was

13   an enrolled student at the school based on the following facts:

14        • CES received hundreds of thousands of dollars annually from EGUSD.  Ross Dep.

15          at 125;

16        • CES received those funds to educate students like C.R. with specialized needs

17          "that cannot be met by the student's public school."  Ross Decl. ¶ 4; and

18        • EGUSD received millions of dollars from the federal government via the state of

19          California to fulfill the requirements of the IDEA.  Commons Decl. Ex. 4 at 198;

20          Commons Decl. Ex. 6 at 201.

21        C.R. argues these facts show CES received federal funding because at least part of the

22   payments EGUSD made to CES must have drawn on its IDEA funding.  Opp'n at 6.  CES

---

[8] C.R. also argues CES is federally funded because it received PPP funds from the federal government.  Pl.'s Opp'n Mot. Summ. J. at 6; Commons Decl. Ex. 5 at 2; Commons Decl. Ex. 8 at 2.  However, under this theory of funding, C.R. does not have standing as she had stopped going to school at CES by February 1, 2020.  *See* Compl. ¶¶ 43–46.  The federal government did not approve any PPP loan for CES until April 14, 2020.  *See* Commons Decl. Ex. 5 at 2.  Here, C.R.'s alleged injuries took place before CES was federally funded by the PPP loans and thus her theory fails to satisfy the causation element necessary to establish Article III standing.  *See generally Pritikin v. Dep't of Energy*, 254 F.3d 791, 796–797 (9th Cir. 2001).

1    responds by arguing C.R. has cited "no evidence that Defendant CES was the direct recipient of

2    federal funding."  Reply at 2.

3            C.R. has the better argument.  Federal funding can be either direct or indirect for the

4    purposes of the Rehabilitation Act.  *See Herman*, 60 F.3d at 1381.  Further, while C.R. has not

5    explicitly established CES received federal funding indirectly, it is a reasonable inference the

6    IDEA money EGUSD received was transferred to CES to fund the education of students who

7    have special needs like "Autism, Attention-deficit/hyperactivity disorder[,] specific learning

8    disabilities, significant emotional and/or behavioral problems and/or cognitive deficits."  Ross

9    Decl. ¶ 5.  As the court draws all reasonable inferences in favor of the nonmoving party at the

10   summary judgment stage, *see Matsushita Elec. Indus. Co.*, 475 U.S. at 487–88, C.R. has done

11   enough to show there is a genuine dispute of material fact regarding CES's receipt of federal

12   funding.

13                        **2.        Intended Beneficiaries**

14           In the alternative, CES argues it was only the incidental beneficiary of federal funding and

15   therefore cannot be liable under § 504 of the Rehabilitation Act.  *See* Mem. at 5–6.  CES bases

16   this argument on *United States Department of Transportation v. Paralyzed Veterans of America*,

17   477 U.S. 597, 605 (1986).  There, the Court held the Civil Aeronautics Board could not apply

18   § 504 to airlines by virtue of the Board's rulemaking power based on the Airport and Airway

19   Development Act of 1970 (the Act).  *Id.* at 599.  The Court noted the Act allocated funds to

20   public airports for the purposes of construction projects, like the building of roads, buildings,

21   sidewalks and parking.  *See id.* at 605.  As the Court noted, "Not a single penny of the money is

22   given to the airlines."  *Id.*  Airlines benefited from the Act, but no funds reached them directly.

23   *Id.*

24           Under CES and Ross's theory, the intended beneficiary of the IDEA must be a LEA or

25   state government.  This argument is unpersuasive as, unlike the airlines in *Paralyzed Veterans*, it

26   is reasonable to infer federal funds reached CES on the current record.  Second, unlike the

27   incidental benefits the airlines received from the Act in *Paralyzed Veterans*, the federal funding

28   CES received was directly related to the purpose of the IDEA: to provide education for students

                                                    14

1    with disabilities  *See* 20 U.S.C. § 1411(a)(1); 20 U.S.C. § 1400(c)(5)(A)–(H).  As its Master

2    Contract with EGUSD makes clear, EGUSD entered into an agreement with CES for "the

3    purpose of providing special education and/or related services to LEA students with exceptional

4    needs . . . ."  Master Contract at 151.  CES thus received federal funding and used that funding to

5    advance the central purpose of the IDEA: to provide special education for students with special

6    needs.

7         Finally, CES argues it cannot be liable under § 504 because there is no evidence CES

8    "'affirmatively chose[]' to enter into the 'quid pro quo for the receipt of federal funds.'"  Mem.

9    at 6 (quoting *Eurofresh v. Castle*, *Inc.*, 731 F.3d 901, 909 (9th Cir. 2013)).  Here as well, C.R. has

10   cited evidence to raise a genuine dispute regarding whether CES intentionally situated itself to

11   receive federal funding for special education services.  For example, CES does not charge parents

12   tuition, and the absence of tuition is a federal requirement of receiving IDEA funding.  Ross Decl.

13   ¶ 10; 34 C.F.R. § 300.146.  Further, in its master contract, CES agreed to abide by California

14   Education Code section 56365 which in turn requires CES to abide by federal regulations that

15   govern schools who receive IDEA funds for special education.  *See* Master Contract at 151;  34

16   C.F.R. § 300.146.  The regulations require the students in private schools to have the same rights

17   as students in public schools, and students in public schools are protected by § 504.  *Id.; see J.W.*

18   *ex rel. J.E.W. v. Fresno Unified School Dist.*, 570 F. Supp. 2d at 1224.  The contract also allows

19   EGUSD to inspect CES to make sure it is in compliance with federal law.  *Id.* § 56366.  A

20   reasonable factfinder could infer that CES knew or should have known it was receiving federal

21   monies in return for having to abide by federal obligations  when it signed its master contract with

22   EGUSD.

23            **3.    Federal Assistance**

24        An entity receiving federal funds is not automatically subjected to the requirements of

25   § 504.  Instead, courts must determine whether "the government intended to provide assistance or

26   merely to compensate."  *Jacobson*, 742 F.2d. at 1209.  Only entities that receive assistance are

27   subject to § 504.  *See id.*  In general terms, compensation refers to a basic contractual relationship,

28   such as the federal government entering into a procurement contract with a vendor, while

15

1    "assistance" usually refers to a federal subsidy for a program. *See id.* To determine whether

2    federal funding should be construed as compensation or as assistance, courts look to "[t]he

3    relevant intention . . . of Congress or that of the administrative agency to which Congress has

4    delegated the power to determine whether assistance should be provided." *Id.*  Courts are to

5    discern governmental intent by "reference to the statutory authority for the particular

6    disbursements at issue or, if the authority to provide assistance has been delegated, to the relevant

7    administrative documents." *Id.*

8         In the IDEA, Congress delegated the authority to provide financial assistance.  It created

9    the "Office of Special Education and Rehabilitative Services" within the federal Department of

10    Education for "administering and carrying out this chapter and other programs and activities

11    concerning the education of children with disabilities." 20 U.S.C. § 1402(a).  One of this office's

12    responsibilities is to disburse block grants to states to "ensure that all children with disabilities

13    have available to them a free appropriate public education that emphasizes special education . . .

14    designed to meet their unique needs . . . ." 34 C.F.R. § 300.1(a).  The block grants "assist States,

15    localities, educational service agencies, and Federal agencies" in providing "for the education of

16    all children with disabilities." *Id.* § 300.1(b).  The federal regulations show the intent of the

17    Department of Education was to provide assistance, not compensation.  Block grants to states are

18    a form of "assistance" to enable schools to provide free special education services for qualifying

19    individuals. *See* 34 C.F.R. § 300.146.

20         A reasonable factfinder could infer CES indirectly received this assistance in the academic

21    year C.R. attended the school.  It is a nonpublic school.  Ross Decl. ¶ 3.  It provides "specialized

22    services to students with educational and/or emotional needs that cannot be met by the student's

23    public school." *Id.* ¶ 4.  LEAs like EGUSD "refer [special needs] student[s] to CES for an

24    enrollment determination." *Id.*  These referrals allow EGUSD to provide IDEA support to the

25    child at a nonpublic school. *See* Cal. Educ. Code § 56365(a).  To obtain these referrals as a

26    matter of law, CES must allow students to enjoy the same rights as children at other schools. *See*

27    *id.;* 34 C.F.R. § 300.146.  As noted, students at public schools are protected by the Rehabilitation

28    Act.

16

1    CES and Ross argue CES is merely receiving compensation from the federal government

2    and not receiving assistance.  Mem. at 5; Reply at 4–5.  But as noted above, the intent of the

3    IDEA and of the Department of Special Education and Rehabilitative Services is to provide

4    assistance to schools to provide special education programs.   Because arguably CES indirectly

5    receives this federal assistance,  a reasonable jury could find CES to be liable under § 504 of the

6    Rehabilitation Act.

7    The court denies CES's motion for summary judgment on C.R.'s third claim under § 504

8    of the Rehabilitation Act.

9    **C.    Unruh Act (Claim Five)**

10    CES and Ross seek summary judgment of C.R.'s claim under the Unruh Act.  Mem. at 7–

11    9.  CES and Ross argue the Unruh Act does not apply to them because CES is not a "business

12    establishment" as defined by the Unruh Act.  *Id.* at 7.  In this respect, the court agrees.

13    The Unruh Act provides, "All persons within the jurisdiction of this state . . . no matter

14    what their . . . disability . . . are entitled to the full and equal accommodations . . . in all business

15    establishments of every kind whatsoever."  Cal. Civ. Code § 51(b).  The California Supreme

16    Court recently clarified the test courts should use when determining what constitutes a business

17    under the Unruh Act.  *See Brennon B. v. Super. Ct.*, 13 Cal. 5th 662, 675 (2022).  In deciding

18    whether or not an entity is a business for the purposes of the Unruh Act, courts look to the

19    "purpose and history of section 51 [of the California Civil Code] in order to determine whether

20    the legislature intended the statute to apply the conduct of the entity at issue."  *Id.* at 675 (quoting

21    *Warfield v. Peninsula Golf & Country Club*, 10 Cal. 4th 594, 616 (1995)).  The primary focus of

22    the Unruh Act is on "private business establishments."  *Id.*  "[I]n order to be a business

23    establishment under the [Unruh] Act—an entity must operate as a business or commercial

24    enterprise when it discriminates."  *Id.* at 679.  When determining whether an entity is operating

25    like a business, courts also look for attributes such as the performance of business functions,

26    "protecting economic value, [and] operating as the functional equivalent of a commercial

27    enterprise."  *Id.* at 681.  The California Supreme Court has held public schools are not business

28    establishments for the purposes of the Unruh Act when they are "acting to fulfill their educational

17

1   role." *Id.*    This is so because "[t]he task of educating students does not involve regularly

2   conducting business transactions with the public, or receiving 'financial benefits from regular

3   business transactions;' nor does it involve 'operating in a capacity that is the functional equivalent

4   of a commercial enterprise.'" *Id.* (quoting *Warfield*, 10 Cal. 4th at 621).

5          CES was not operating as a business establishment with respect to C.R. in 2019–2020

6   when she attended the school.  CES did not charge C.R. or her classmates tuition.  Ross Decl.

7   ¶ 10.  Instead EGUSD and other public school districts referred students to CES and then paid

8   CES through a master contract.  *Id.* ¶ 11.  There is no evidence in the record CES charged C.R. or

9   her family for anything—nothing, in any event, resembling a business transaction.  And

10  according to its master contract signed with EGUSD, CES was not allowed to make a "charge of

11  any kind to parents for special education and/or related services."  Master Contract at 24.  Any

12  charges to the parents could only be for activities "not necessary . . . to receive a free appropriate

13  public education . . . ."  *Id.*  Effectively, CES was acting like a public school towards C.R. when it

14  provided her education in 2019–2020 and was therefore not a "business" for the purposes of the

15  Unruh Act.  *See Brennon B.*, 13 Cal. 5th at 681.

16         C.R. points to CES annual revenues that approach $2 million.  Opp'n at 11; Ross Dep. at

17  125.  Further, CES is incorporated as a business in the state of California.  Commons Decl. Ex. 9.

18  And, CES took out a PPP loan with the federal government in April 2020 and listed itself as both

19  a school and a "retail" business.  Commons Decl. Ex. 5 at 2.  At oral argument, C.R. emphasized

20  CES's retail nature when arguing the Unruh Act applies to CES.

21         To be sure, CES is organized as a business.  The evidence for CES's operating as a

22  "retail" business, however, is slim.  C.R. can point only to what appears to be a business

23  description of "retail" chosen from a drop-down menu on an application for a PPP loan.  *See*

24  Commons Decl. Ex. 5 at 2.  Formality or hypertechnical labels are not what determines whether

25  an entity operates as a business under the Unruh Act.  Courts care more about the functional

26  relationship between the entity and the person alleging discrimination than about the entity's

27  formal status.  In *Warfield v. Peninsula Golf & Country Club*, for example, the California

28  Supreme Court found a nonprofit golf and country club to be a business establishment under the

18

1   Unruh Act because the club and its proprietary members had conducted businesslike activities on

2   the premises, including renting the dining and bar facilities, providing food and beverage

3   services, and exacting green fees for use of its golf course.  10 Cal. 4th at 621.  The club was

4   functionally a business.  *See Brennon B.*, 13 Cal. 5th at 680.  Here, by contrast, CES is organized

5   legally as a business but operates with respect to C.R. as a non-profit as it cannot, by the terms of

6   its contract, charge her for her public education.  *See* Master Contract at 24.  There is thus nothing

7   transactional in the relationship between CES and C.R.

8         C.R. also argues federal courts have rejected the defendants' argument that a private

9   school is not a business under the Unruh Act.  *See* Opp'n at 11.  As defendants point out,

10  however, C.R. has cited no cases decided since the California Supreme Court's decision in

11  *Brennon B*.  *See* Reply at 6.  Further, C.R. errs, both in her opposition and at oral argument, in

12  claiming the legislative history of the Unruh Act of 1959 supports her position because the

13  legislators who fashioned the modern Unruh Act were responding to cases like *Reed v.*

14  *Hollywood Professional School* that had declined to include private schools within the ambit of

15  the Unruh Act.  *See* Opp'n at 11 (citing 169 Cal. App. 2d Supp. 887, 892 (1959)).  The California

16  Supreme Court in *Brennon B.*, however, has determined otherwise, noting the legislative history

17  reveals a narrowing and then eliminating of references to schools altogether, reflecting a

18  disinclination to have schools subject to Unruh Act liability.  *See* 13 Cal. 5th at 676–77.

19        The court grants CES and Ross's motion for summary judgment of C.R.'s fifth claim

20  under the Unruh Act.

21        **D.    Statutory Negligence (Claim Six)**

22        CES and Ross seek summary judgment of C.R.'s sixth claim, which alleges they violated

23  several provisions of the California Government and Education codes.  *See* Compl. ¶¶ 105–14

24  (citing Cal. Gov't Code §§ 815.2(a), 815.6, 820 and Cal. Educ. Code § 44807).  At oral argument,

25  CES and Ross conceded that if the court were to grant C.R.'s motion to amend her complaint,

26  which eliminates accusations that Ross and CES violated these statutes, their motion for summary

27  judgment of this claim would be rendered moot. Because the court has granted C.R.'s motion to

19

amend her complaint, it denies Ross and CES's motion for summary judgment of C.R.'s sixth claim as moot.

## VI. CONCLUSION

The court **orders** as follows:

- C.R.'s motion to amend her complaint (ECF No. 138) is **granted**. C.R. shall file the amended complaint, which is currently attached as an exhibit at ECF No. 138-2, on the docket with the title "First Amended Complaint" within **7 days of the filed date of this order**.

- CES and Ross's motion for partial judgment on the pleadings (ECF No. 120) is **denied as moot**.

- CES and Ross's motion for partial summary judgment (ECF No. 119):
  - is **denied** as to C.R.'s Rehabilitation Act claim (claim three in the original complaint).
  - is **granted** as to C.R.'s Unruh Act claim (claim five in the original complaint).
  - is **denied as moot** as to C.R.'s statutory negligence claim (claim six in the original complaint).

- A final pretrial conference is set for **June 26, 2025, at 10:00 a.m**. The parties shall meet and confer and file a joint status report **7 days prior** to the final pretrial conference addressing matters the court should consider in setting a trial date, including whether they request referral to a magistrate judge to conduct a further court-convened settlement before the final pretrial conference. *See* E.D. Cal. L.R. 282; Fed. R. Civ. P. 16.

This resolves ECF Nos. 119, 120, and 138.

IT IS SO ORDERED.

DATED: May 14, 2025.

_____
SENIOR UNITED STATES DISTRICT JUDGE